Opinion issued October 29, 2024



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00025-CV

_____

**KELSEY-SEYBOLD MEDICAL GROUP, PLLC D/B/A
KELSEY-SEYBOLD CLINIC, Appellant**

**V.**

**MARC ROBERTS, Appellee**

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Case No. 2019-34942**

---

## MEMORANDUM OPINION

This is a medical malpractice case. Appellee Marc Roberts sued Appellant Kelsey-Seybold Medical Group, PLLC d/b/a Kelsey-Seybold Clinic ("Kelsey-Seybold") for negligence, claiming it failed to properly diagnose a blood

clot in his right leg, causing injuries. The trial court conducted a jury trial, which Roberts won. It then entered a final judgment based on the verdict, awarding Roberts past and future medical expenses, loss of future earning capacity, court costs, and pre- and post-judgment interest.

On appeal, Kelsey-Seybold does not challenge the jury's liability finding or the trial court's award of past medical expenses or court costs. Instead, Kelsey-Seybold (1) makes legal and factual sufficiency challenges to the jury's award of future damages; (2) argues the trial court applied incorrect pre- and post-judgment interest rates; and (3) contends the trial court should have awarded periodic payments of the judgment amounts for future damages under the Texas Medical Liability Act.

We agree the trial court applied incorrect interest rates, so we reverse and remand the trial court's award of pre- and post-judgment interest. In all other respects, we affirm the trial court's judgment.

## Background

Roberts is a firefighter paramedic with the Houston Fire Department ("HFD" or the "Fire Department"). In May 2017, Roberts began experiencing pain and numbness in his right foot. He went to Kelsey-Seybold for treatment.

2

## A.    Roberts's Treatment at Kelsey-Seybold.

Over the next four months, Roberts made 14 visits to Kelsey-Seybold and saw 10 different Kelsey-Seybold physicians of various specialties. He complained of progressively worsening pain from the knee down, ranging from minimal to "excruciating." For most of that time, the doctors told Roberts his pain was being caused by radiculopathy (a nerve condition) or Complex Regional Pain Syndrome. They did not test for vascular or circulation issues even though the doctors at times observed that Roberts's foot was "pale" and "cool to the touch." At trial, one of Roberts's medical experts testified that these symptoms should have been "screaming at them in the face" with a blood clot diagnosis.

A little over three months after his first visit to Kelsey-Seybold, Roberts saw a family medicine doctor there. He still was complaining of worsening leg pain and got no relief from any of the prescribed medications. This doctor investigated vascular problems for the first time. Among other tests, the doctor ordered an ultrasound of Roberts's leg.

The ultrasound revealed Roberts had blood clots that left him with "no blood flow" from the knee down. The doctor reading the ultrasound told Roberts to go the hospital immediately. Roberts drove himself to Baylor St. Luke's Medical Center ("St. Luke's"), which is not a Kelsey-Seybold facility. Upon admission, Roberts was given pain medication and blood thinners and was seen by two vascular surgeons.

The surgeons at first told Roberts that because of the delay in seeking treatment, it was likely they would need to amputate his leg.

Roberts did not lose his leg, but over the next two days he underwent two surgeries at St. Luke's. The first was a diagnostic procedure to identify the blockage. The second, performed the next day, was a surgery to remove the blood clots, which were present "from his groin all the way down to his foot."

The appearance of the clots revealed that some had been there for a long time, while others were newly formed. As a result of having clots for a long time, Roberts also developed scar tissue and suffered permanent nerve and vascular damage in his right leg and foot, leaving him more susceptible to clots. Roberts later developed two more clots, and he was diagnosed with Peripheral Artery Disease.

## B.    The Trial Testimony.

Trial began five years after Roberts's initial surgery. Roberts testified that he continued to suffer from significant and sometimes debilitating pain in his lower right leg and foot, and that the pain was continually growing worse. Roberts also testified that he had developed "drop foot," had frequent medical appointments for pain management, and regularly took pain medications that gave him "brain fog." Roberts's medical experts testified that he is likely to need a spinal cord stimulator ("SCS"), a device placed around the spinal cord to block pain signals to the brain.

The pain became so significant that Roberts consulted a doctor about the possibility of amputating his leg below the knee. At trial, one of Roberts's medical experts testified an amputation would be the "only way" for Roberts to have a normal life. And multiple doctors opined that Roberts would need an amputation. For example, one medical expert testified that "it's more than likely" that Roberts would need to have his leg amputated, and another testified that an amputation "is going to be necessary."

Roberts's injuries also affected his work as a firefighter. Roberts returned to work in November 2017, and he was working at the time of trial. But after the clotting episode, he transferred from one of the busiest fire stations in Houston to a slower station with far less call volume.

As of the trial, Roberts had been working for the Fire Department for 17 years, a tenure that affects Roberts's pension eligibility. The City of Houston's guaranteed pension vests when a firefighter reaches 20 years of service. For firefighters with 20 years of service, the pension program pays a lifetime monthly benefit of around 50 percent of their average monthly salary. But if a firefighter does not achieve the 20-year service mark, he receives no pension benefits (though any investment in the retirement fund is refunded with interest). Thus, there is a significant retirement benefit for firefighters who vest after 20 years of service.

Firefighters who work beyond the 20-year service mark become eligible to receive another two percent increase in their pension amounts, up to 30 years of service. They also become eligible to participate in HFD's Deferred Retirement Option Program ("DROP"), which lets them defer and place their pension payments in a fund for the next 13 years, such that they receive a lump sum with interest upon retirement, in addition to their monthly pension benefits.

Roberts testified that before developing blood clots, he intended to retire after 33 years of service to maximize both HFD's pension program and its DROP. But after the clotting episodes and related complications, Roberts was uncertain whether he would make even the 20-year mark.

Roberts's colleagues were also skeptical that he could continue to serve as a firefighter. An HFD District Fire Chief testified that Roberts was presently not fit for duty because of the pain medications he was taking, and that Roberts was unable to "serve the citizens of Houston effectively at this point." Likewise, a Paramedic Captain testified that HFD firefighters should be able to work at any fire station at any time, no matter how busy. And if Roberts has an amputation or receives an SCS, he would be ineligible to serve.

## C. The Damages Awards and Post-judgment Motions.

Roberts asked the jury to award economic damages for past medical expenses, future medical expenses, and future loss of earning capacity. He supported those

requests with testimony from, among others, Dr. E. Elizondo, a physical medicine specialist and life care planner, and S. Ford, a vocational economic analyst. Dr. Elizondo proposed a "life care plan" covering Roberts's future medical and other needs attributable to the clotting and related complications. The lifecare plan was around $2.6 million at its then-present value.

Ford testified to a range of alternative calculations of Roberts's lost future earning capacity. She testified that if he separated from HFD at age 55 and could find other work, his lost earning capacity would be $747,618. Alternatively, if Roberts separated from HFD earlier, at age 51 and could find other work, his lost earning capacity would be $908,923 (or $960,716 when adjusted to present value). And the "worst case scenario" Ford presented was one in which Roberts separated from HFD immediately and never worked again, in which case his loss of earning capacity would "approach[] . . . the $1.5 million figure," based on her calculation of Roberts's lifetime earnings of $1,534,737, net of taxes.

The jury returned a verdict in Roberts's favor. It awarded him $173,798 in past medical expenses, $2.35 million in future medical expenses, and $961,000 in loss of future earning capacity, for a total of $3,484,798. The jury found that these sums of money, "if paid now in cash," would compensate Roberts for his injuries.

The parties circulated a proposed final judgment based on the jury verdict. The proposed final judgment ordered Roberts be paid the full amount awarded to

him by the jury, plus court costs and interest, and "execution to issue on this judgment." The proposed final judgment did not mention periodic payments. It was signed by Kelsey-Seybold's counsel as "approved as to form," and at a subsequent hearing, counsel for Kelsey-Seybold responded "No" when the trial court asked whether there were "any objections to the form of the judgment." The trial court then signed and entered the judgment.

After judgment was entered, Kelsey-Seybold made three motions: (1) for judgment notwithstanding the verdict; (2) for new trial or for remittitur; and (3) to modify, correct, or reform the judgment. In them, Kelsey-Seybold challenged the legal and factual sufficiency of the evidence, objected to the judgment interest rate, and asked that the judgment be modified to allow for periodic payments. The trial court denied all three motions.

## Analysis

Kelsey-Seybold does not challenge the jury's finding of negligence or award of past medical expenses. Instead, Kelsey-Seybold's appeal is limited to the jury's award of future medical expenses and lost earning capacity, and to the trial court's denial of its post-judgment motions. It raises three points of error, challenging (1) the *legal* sufficiency of the evidence supporting the jury's awards of lost earning capacity and future medical expenses; (2) the *factual* sufficiency of the evidence

supporting the jury's awards of lost earning capacity and future medical expenses; and (3) the denial of its request for periodic payments and a lower interest rate.

## I. The Trial Court Properly Denied Kelsey-Seybold's Motion for Judgment Notwithstanding the Verdict.

Kelsey-Seybold contends the trial court erred in denying its motion for judgment notwithstanding the verdict ("JNOV") because there was legally insufficient evidence to support the jury's award of both lost future earning capacity and future medical expenses.

### A. Standard of Review.

We review a trial court's denial of a JNOV under a legal sufficiency or "no evidence" standard. *See Garton v. Rockett*, 190 S.W.3d 139, 144 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("A trial court may grant a motion for judgment notwithstanding the verdict only if there is no evidence to support the jury's finding."). A no-evidence challenge "'will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.'" *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

9

A jury's verdict "must be upheld" if it is supported by "more than a scintilla of evidence." *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). More than a scintilla of evidence exists if it "rises to the level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Only when evidence is "so weak as to do no more than create a mere surmise" is there no more than a scintilla, and thus no evidence. *Id.*

In conducting its review, this Court must "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Therefore, we "view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary." *Tiller v. McClure*, 121 S.W.3d 709, 713 (Tex. 2003). "If the evidence falls within the zone of reasonable disagreement, we may not invade the role of the fact-finder, who alone determines the credibility of the witnesses, the weight to give their testimony, and whether to accept or reject all or any part of that testimony." *Rosenblatt v. Freedom Life Ins. Co. of Am.*, 240 S.W.3d 315, 319 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

Kelsey-Seybold challenges the legal sufficiency of the jury's award of lost earning capacity and future medical expenses. Under the standards set forth above, we must uphold the jury's verdict on these issues so long as they are supported by "more than a scintilla of competent evidence." *Bank of Am., N.A. v. Eisenhauer*, 474 S.W.3d 264, 265 (Tex. 2015).

**B.      The Jury's Verdict on Loss of Future Earning Capacity Is Supported by More Than a Scintilla of Evidence.**

Kelsey-Seybold first challenges the legal sufficiency of the jury's award of $961,000 in damages for lost future earning capacity. Lost earning capacity is a measure of the plaintiff's capacity to earn a livelihood before injury, as compared to the extent to which the injury impaired that capacity. *See Hospadales v. McCoy*, 513 S.W.3d 724, 742 (Tex. App.—Houston [1st Dist.] 2017, no pet.) It is not a measure of the plaintiff's actual earnings, but rather of the plaintiff's loss of capacity to earn. *See Brazoria Cnty. v. Davenport*, 780 S.W.2d 827, 832 (Tex. App.—Houston [1st Dist.] 1989, no pet.).

Therefore, lost earning capacity "is not measured by what a person actually earned before an injury, but by the person's *capacity* to earn, even if he had never worked in that capacity in the past." *Stewart & Stevenson, LLC v. Foret*, No. 01-11-01032-CV, 2013 WL 4337319, at *13 (Tex. App.—Houston [1st Dist.] Aug. 15, 2013) (mem. op.) (emphasis in original) (citing *Scott's Marina at Lake Grapevine, Ltd. v. Brown*, 365 S.W.3d 146, 158–59 (Tex. App.—Amarillo 2012,

11

pet. denied)). "It is the loss of earning capacity, rather than loss of earnings resulting from the injury, that is the determining factor." *Brazoria Cnty.*, 780 S.W.2d at 832. "The measure of this type of damages is the plaintiff's diminished earning power or earning capacity in the past or in the future directly resulting from the injuries he has sustained." *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

To support a claim for lost earning capacity, a plaintiff must introduce evidence "sufficient to allow the jury to reasonably measure earning capacity in monetary terms." *Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.). But there is "no general rule governing the proof required," and the plaintiff need not show "actual earnings, life expectancy, or even the plaintiff's employment at the time of the injury." *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 36 (Tex. App.—Tyler 2003, pet. denied). Instead, this showing can be "based on a composite of all of the factors affecting earning capacity," *Tri-State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 492 (Tex. App.—Houston [14th Dist.] 1989, no pet.), including factors such as "past earnings," *id.*, and matters like "stamina, efficiency, ability to work with pain, and the weakness and degenerative changes which naturally result from an injury and from long suffered pain." *Springer v. Baggs*, 500 S.W.2d 541, 544 (Tex. App.—Texarkana 1973, writ ref'd n.r.e.).

But even when a plaintiff presents evidence on each of these points, assessing loss of earning capacity can be imprecise. "[T]he amount of money a plaintiff might earn in the future is always uncertain." *Plainview Motels*, 127 S.W.3d at 35. As a result, "[l]oss of earning capacity that a plaintiff will suffer in the future . . . is left largely to the jury's sound judgment and discretion." *Tri-State Motor Transit Co.*, 765 S.W.2d at 492 (citing *McIver v. Gloria*, 169 S.W.2d 710, 712 (Tex. 1943)). Considering the jury's discretion in this area, "courts have consistently upheld judgments for reduced earning capacity, even though the plaintiff was making as much or even more money after the injury than before, where it was shown that pain, weakness, diminished functional ability or the like indicated that plaintiff's capacity to get and hold a job, or his capacity for duration, consistency or efficiency of work was impaired." *Springer*, 500 S.W.2d at 545.

The jury's discretion, though, is not unfettered. Its award for loss of earning capacity must be based on the evidence presented at trial. *See Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("[T]he jury has discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for the jury's calculation."). And it is not free to ignore clear or undisputed evidence. *See City of Keller*, 168 S.W.3d at 820. "But whenever reasonable jurors could decide what testimony to discard, a reviewing court must

assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review." *Id*.

The jury awarded Roberts $961,000 in lost future earning capacity. Kelsey-Seybold contends no evidence supports this award because: (a) it exceeded the lost earning capacity damages presented by Ford, Roberts's vocational economics expert; (b) even if it had been within range, Ford's calculations were based on false assumptions; and (c) Roberts failed to show a reduction in actual earnings between the time of his injury and trial. None of these arguments entitles Kelsey-Seybold to reversal.

### 1. The Jury's Verdict Was Within the Range Presented by Ford.

Kelsey-Seybold argues no evidence supports the jury's award of $961,000 for loss of future earning capacity because Ford "gave the jury two options" for measuring Roberts's lost earning capacity: $908,000 if he were to separate from HFD at age 51 ($960,716 when adjusted to present value); or $748,000 if he were to separate from HFD at age 55. Because the jury awarded $961,000 for lost earning capacity, Kelsey-Seybold contends the verdict exceeds the ceiling of of Ford's testimony.

This argument misconstrues the evidence. Ford gave the jury more than "two options" for an award for lost earning capacity. To be sure, Ford presented alternative calculations of Roberts's lost earning capacity, valued at $748,000 and

14

$908,000. And she testified that those figures were based on assumptions that Roberts would separate from HFD at ages 55 and 51, respectively, and then find other work after his separation. But Ford did not testify that either of these figures represented a ceiling on Roberts's lost earning capacity. To the contrary, she said they were the "most conservative" estimates and "the rosy scenario" because they assumed Roberts could find alternative work after separating from the Fire Department.

Nor were these numbers the only ones. Ford also testified about a less rosy scenario in which Roberts had an amputation or an SCS, or otherwise had to separate from the Fire Department, and then could not find work again. She testified that in those circumstances, Roberts's loss of earning capacity "gets closer to 1.5 million," based in part on her calculation of Roberts's lifetime earnings as $1,534,737, net of taxes and with all retirement and DROP benefits available at HFD. Thus, Ford's testimony placed Roberts's lost earning capacity between $748,000 and $1,534,737.

The jury also heard testimony about Roberts's medical condition, which was relevant to his future earning capacity. For example, Roberts testified that although he wanted to continue working for as long as possible, his condition left him uncertain as to whether he could do so, and that on some days he did not know if he would "make it through tomorrow" and felt like he lived "day to day." Likewise, an HFD District Chief testified that Roberts was unfit for duty because of the pain

15

medications he was taking. And multiple doctors testified that they believed Roberts would require an amputation, which would force Roberts's separation from the Fire Department. Such testimony could lead a reasonable juror to find that Roberts's tenure with HFD was as limited as his future work prospects.

Based on this evidence, the jury reasonably could have concluded that Roberts would soon separate from HFD. It also could have concluded that Roberts would be unable to find alternative work, or work with comparable earning power, after doing so. And as a result, it was reasonable for the jury to conclude that Roberts's lost earning capacity from Kelsey-Seybold's negligence was $961,000, a figure that falls within the range Ford presented at trial. *See W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 898 (Tex. 2020) (upholding damages award for loss of future earning capacity because "[i]f more than a scintilla of competent evidence supports the judgment, the jury's verdict must be upheld").

Kelsey-Seybold's reliance on *San Antonio v. Esparaza*, No. 04-04-00631-CV, 2005 WL 3477826 (Tex. App.—San Antonio Dec. 21, 2005, no pet.) (mem. op.), does not change our conclusion. There, the court reversed a jury's award of $100,000 for a babysitter's loss of future earning capacity because she was continuing to babysit at the time of trial and the record contained no evidence that she "would not be able to continue babysitting in her home." *Id*. at *5. But it is not as if the jury heard "no evidence" of Roberts's loss of future earning capacity. *Id*. As described

16

above, the jury heard evidence from which it could conclude that Roberts could not continue working as a firefighter and possibly could not work at all. *Esparza* thus is not persuasive. *Cf. Springer*, 500 S.W.2d at 544 ("One may have a definitely reduced capacity to earn throughout his remaining reasonable life expectancy, and yet still be making as much money a relatively short time after the injury as he was before the injury.").

## 2. Ford's Calculations Were Not Based on False Assumptions.

Kelsey-Seybold next contends the jury's award of damages for loss of future earning capacity should be reversed because Ford's testimony rests on incorrect assumptions—that Roberts would need an amputation, would retire at age 51, and would be unable to work (or to make comparable earnings) after retirement. The evidence presented at trial either supports these assumptions or shows that Ford's testimony did not rely on them.

Consider Kelsey-Seybold's argument that Ford's calculations of Roberts's lost future earning capacity were incorrect because they assumed he would retire at age 51. Kelsey-Seybold contends this assumption cannot be correct because Roberts "was already 52 at trial." Roberts, however, testified that he was 51. A reasonable juror thus could credit Ford's calculation of Roberts's lost earning capacity beginning at age 51.

17

Kelsey-Seybold next contends no evidence supports Ford's calculations because they assumed Roberts would need an amputation, even though he had not had one as of the trial. But this argument again misconstrues Ford's testimony. She said her calculations assumed Roberts would separate from HFD at age 51 or age 55, for any reason related to his medical condition, just one of which might be an amputation. And for the reasons discussed above, the jury was presented with evidence that Roberts's condition could prompt his imminent separation from the Fire Department. But even if that were not the case, multiple doctors said Roberts would likely need an amputation. Thus, the jury could have reasonably concluded that Roberts would separate from the Fire Department shortly after trial, at ages 51 or 55, either because of the amputation or for other medical reasons, and agreed with Ford's calculations.

Finally, Kelsey-Seybold contends no evidence supports Ford's calculations of Roberts's lost earning capacity because they relied on the false assumption that he will not be able to work after leaving the Fire Department. But the only scenario Ford presented to the jury relying on this assumption was her "worst case scenario," in which Roberts could not work at all after leaving the Fire Department. If that were to occur, she testified, Roberts's loss of earning capacity would "approach[] . . . the $1.5 million figure," about $600,000 more than the jury's award.

For her other calculations, Ford did not assume Roberts would be unable to work. Instead, she placed Roberts's lost earning capacity at $748,000 or $908,000 (or $960,716 when adjusted to present value), based on an assumption that he would retire at ages 51 or 55, respectively, and find other work. But Ford also testified that if Roberts does have an amputation or gets an SCS—either of which a reasonable juror could conclude would occur based on the trial testimony—the numbers are likely to increase because those limitations would diminish Roberts's chance of finding work that paid as much as his job with HFD. The evidence thus supports the jury's award of $961,000 in lost future earning capacity. *See W & T Offshore*, 610 S.W.3d at 899 (jury can use "common knowledge and experience and sense of justice" in determining loss of earning capacity, and thus it was "within the sound judgment and discretion of the jury" to consider that the plaintiff's "physical impairment" meant "the work options available to him in the future were limited" (citation and internal quotation marks omitted)).

### 3. Roberts Did Not Have to Show a Reduction in Actual Earnings Before Trial.

Kelsey-Seybold also argues that no evidence supported the jury's award of damages for loss of future earning capacity because Roberts did not show reduced earnings between the time of his injury and trial, such that there was "no reduction in actual earnings on which to base a future award." But actual earnings as of the

19

time of trial is not necessarily the measure of a plaintiff's loss of earning capacity. *See Brazoria Cnty.*, 780 S.W.2d at 832.

While "evidence of actual earnings at the time of trial is the *best* evidence of future earning capacity, . . . it is not the *only* evidence in an inquiry that looks many years or decades into a person's future." *W & T Offshore*, 610 S.W.3d at 899 (emphasis in original). Roberts's claim is for lost earning *capacity*, not lost earnings. *Cf. JMI Contractors, LLC v. Medellin*, No. 04-22-00072-CV, 2024 WL 3954210, at *13 (Tex. App.—San Antonio Aug. 28, 2024, no pet.) ("Remaining mindful the measure of damages for loss of future earning capacity is not based on a person's past earnings, but instead on a person's capacity to earn, we conclude the jury could have inferred Medellin would be unable to resume his roofing work to his former ability. . . . Thus, JMI's contention Medellin returned to roofing work after the accident is irrelevant.").

And here, the evidence presented at trial was that because of his medical condition and his uncertain ability to work, Roberts's lost earning capacity ranged from $748,000 to $1,534,737. Therefore, it was reasonable for the jury to award him $961,000. We conclude there was legally sufficient evidence to support the jury's award of damages for lost earning capacity, and thus the trial court properly denied Kelsey-Seybold's motion for JNOV on this issue. *See Gharda USA, Inc. v. Control*

*Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015) ("If more than a scintilla of evidence supports the verdict, it must be upheld.").

**B.    The Jury's Verdict on Future Medical Expenses Is Supported by More Than a Scintilla of Evidence.**

We also conclude the trial court properly denied Kelsey-Seybold's motion for JNOV on future medical expenses, for which the jury awarded $2.35 million.

**1.    Roberts Presented Sufficient Evidence to Support the Jury's Award of Future Medical Expenses.**

To recover future medical expenses, a plaintiff must show a "reasonable probability" that future medical care will be required and the reasonable cost of that care. *Finley v. P.G.*, 428 S.W.3d 229, 233 (Tex. App.—Houston [1st Dist.] 2014, no pet.). The jury may determine reasonable probability by considering "the substance of the testimony" rather than "semantics or the use by [a] witness of any particular term or phrase." *Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966); *see also Robinson v. Garcia*, No. 11-12-00295-CV, 2016 WL 1725297, at *3 (Tex. App.—Eastland Apr. 29, 2016, pet. denied) (mem. op.). A plaintiff need not establish the cost of future medical care through expert testimony or with absolute certainty. *See Finley*, 428 S.W.3d at 233; *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 426 (Tex. App.—Eastland 2006, no pet.); *Whole Foods Mkt. Sw., L.P. v. Tijerina*, 979 S.W.2d 768, 781 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

In fact, no precise evidence is required. *See Finley*, 428 S.W.3d at 233; *Snyder*, 191 S.W.3d at 426.

Generally, "the award of future medical expenses rests within the sound discretion of the jury." *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *see also Whole Foods Mkt.*, 979 S.W.2d at 781. And the jury can decide the amount of future medical expenses and care based on the injuries the plaintiff suffered, the medical care rendered before trial, the progress toward recovery under the treatment received, and the plaintiff's condition at the time of trial. *See Finley*, 428 S.W.3d at 233; *Rosenboom Mach.*, 995 S.W.2d at 828; *see also Whole Foods Mkt.*, 979 S.W.2d at 781 ("The reasonable value of future medical care may be established by evidence of the reasonable value of past medical treatment.").

"Determination of the expense of future treatment is a matter for the jury to determine in the exercise of [its] sound discretion under proper instructions from the court." *Blankenship v. Mirick*, 984 S.W.2d 771, 778 (Tex. App.—Waco 1999, no pet.) (quoting *Thate v. Tex. & P. Ry. Co.*, 595 S.W.2d 591, 601 (Tex. App.—Dallas 1980, writ dism'd)). Appellate courts thus hesitate to disturb jury findings on future medical expenses. *See Finley*, 428 S.W.3d at 234; *see also Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied) ("Because issues such as life expectancy, medical advances, and the future costs of products and services

22

are, by their very nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages." (footnote omitted)).

Roberts presented expert testimony of a reasonable probability that he would continue to need medical care. For example, one medical expert testified that because of the delay in diagnosing the clots in his leg, Roberts continues to suffer from: "irreversible and incurable" nerve damage; "foot drop," a condition of nerve damage that results in Roberts struggling to lift his foot, such that it drags when he walks; Peripheral Artery Disease; Complex Regional Pain Syndrome; and an enhanced susceptibility to developing additional clots. Another medical expert testified that it will be "impossible" for Roberts to recover.

Roberts himself testified about his need for ongoing medical care. He said his symptoms have worsened over time, his pain has become more severe since the injury, he takes several medications to relieve the pain, and he has frequent medical appointments to manage his pain. Roberts also testified his pain had become so severe that he is considering amputating his leg, and two different medical experts testified they believed an amputation would be necessary. Those medical experts also testified that Roberts may need an SCS to manage his pain. Based on this evidence, a reasonable juror could conclude there was a reasonable probability Roberts would need future medical care.

Roberts also presented evidence of the cost of that care. He did so primarily through the expert testimony of Dr. Elizondo, his life care planner. Dr. Elizondo proposed a life care plan estimating the costs of the treatments and products Roberts will need for the rest of his life to deal with his medical condition. Dr. Elizondo's life care plan placed the total cost of Roberts's lifetime care at around $2.6 million, which is greater than the jury's award of $2.35 million for future medical expenses.

## 2. Kelsey-Seybold Does Not Successfully Challenge the Award of Future Medical Expenses.

Kelsey-Seybold contends no evidence supports the jury's award for three reasons. First, it argues that about $1.7 million of Dr. Elizondo's life care plan is for costs associated with an amputation, even though there was no evidence that Roberts would ever need one, let alone that he would need one imminently. Second, Kelsey-Seybold claims Dr. Elizondo's life care plan failed to segregate the costs of Roberts's future medical needs that were caused by Kelsey-Seybold's negligence from those attributable to an "underlying vascular condition." And finally, Kelsey-Seybold argues no evidence supports Dr. Elizondo's life care plan because "there was a complete absence of a vital fact"—it assumes Roberts would begin to accrue future medical care costs at age 51 when "he was already 52 at trial."

### a. Evidence About Roberts's Need for an Amputation.

Two medical experts testified there was a reasonable probability Roberts would need an amputation. When asked whether he believed "within a reasonable

24

degree of medical certainty [that an amputation is] going to be necessary," Dr. M. Fotech answered, "I think it's going to be necessary, yes," because "Roberts is not going to get any better." Similarly, when asked, "Is it more likely true than not true, based on not just vascular problems from the long-sustained clot, but also the chronic pain, ischemia, CRPS, that [Roberts] will need an amputation," Dr. Elizondo answered, "Yes." And on cross-examination, Dr. Elizondo testified that there was a "reasonable medical probability" Roberts would need an amputation. This testimony was evidence of a reasonable probability that Roberts would need an amputation, and thus a reasonable juror could conclude that Dr. Elizondo properly included the costs associated with an amputation in his life care plan.

While the record does not contain specific evidence of when an amputation might be necessary, a reasonable juror also could conclude that Roberts would need one soon. Roberts testified that his pain is getting worse and can sometimes be "excruciating," and that he continues to have drop foot. His wife similarly testified about how pain limits Roberts's daily life. Perhaps most tellingly, Roberts testified that he has already consulted a doctor about the amputation because he thinks it may be a way for him to "go back to a more normal life." Because of this and similar testimony, there was evidence from which the jury could conclude not only that an amputation was a reasonable probability but also an imminent one.

**b.    Evidence About an "Underlying Vascular Condition."**

Kelsey-Seybold's next attack on Dr. Elizondo's life care plan is based on an alleged failure to segregate the costs of Roberts's future medical needs caused by Kelsey-Seybold's negligence from those caused by an "underlying vascular disease," which it says "Kelsey-Seybold did not cause." The evidence presented at trial pointed the other way.

To be sure, Roberts's medical experts testified he had been diagnosed with Peripheral Artery Disease and permanent vascular damage. But Dr. Fotech also testified that Kelsey-Seybold's delay in diagnosis caused these conditions. In fact, Dr. Fotech told the jury, "[t]he duration of the clot is what lead to all of this," and "the only cause" of "all [Roberts's] complaints" is "the damage from the first clot being there so long." In other words, the evidence was that Roberts's vascular condition was caused by Kelsey-Seybold's negligence.

The only evidence Kelsey-Seybold cites for its contention that Roberts had an underlying vascular condition that it did not cause is Dr. Elizondo's testimony. But Dr. Elizondo testified only that Roberts had a vascular condition as of the time of trial; he declined to offer any opinions about its cause. Therefore, Dr. Elizondo's testimony does not support Kelsey-Seybold's claim that Roberts had a pre-existing vascular condition for which it should not be responsible.

### c. Evidence About Roberts's Age at the Start of Dr. Elizondo's Life Care Plan.

Kelsey-Seybold's final legal sufficiency challenge to Dr. Elizondo's life care plan is based on Roberts's age. Kelsey-Seybold argues no evidence supported the life care plan because it assumed Roberts's care needs would begin when Roberts was 51 years old, and Roberts "was already 52 at trial." But Roberts testified that he was 51 at the time of trial, which negates the premise for Kelsey-Seybold's argument.

In any case, a one-year difference in the starting point for Roberts's care under Dr. Elizondo's life care plan would not render it legally insufficient. Based on the trial testimony, the jury could still conclude Roberts would need the care outlined in Dr. Elizondo's life care plan at age 51 or age 52, given the possibility that he would outlive the 30-year life expectancy that Dr. Elizondo assumed in preparing the plan. *See Gunn v. McCoy*, 554 S.W.3d 645, 679 (Tex. 2018) (life care plan not legally insufficient even though the life expectancy it assumed for the plaintiff was inaccurate, because "[w]hile evidence must establish a reasonable probability of future medical expenses in order to support an award, such an award, by its nature, evades certainty"); *Saeco Elec. & Util., Ltd. v. Gonzales*, 392 S.W.3d 803, 808 (Tex. App.—San Antonio 2012, pet. denied) ("Because issues such as life expectancy, medical advances, and the future costs of products and services are, by their very

27

nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages." (citation and internal quotation marks omitted)).

Accordingly, we conclude the jury's award of $2.35 million in future medical expenses, which was below Dr. Elizondo's life care plan's projected amount, was supported by legally sufficient evidence. The trial court properly denied Kelsey-Seybold's JNOV motion. We overrule Kelsey-Seybold's first issue.

## II.     The Trial Court Properly Denied Kelsey-Seybold's Motion for New Trial.

Kelsey-Seybold also challenges the factual sufficiency of the jury's awards of loss of future earning capacity and future medical expenses. Alternatively, it contends these awards should be remitted to the trial court because their amounts exceeded the damages evidence presented at trial. Kelsey-Seybold contends the trial court abused its discretion by denying the motion for new trial raising these factual sufficiency points. Again, we disagree.

### A.     Standard of Review.

When a party attacks the factual sufficiency of an adverse finding on an issue for which it did not have the burden of proof at trial, it must show on appeal that there is insufficient evidence to support the adverse finding. *See Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985). To conduct this review, we examine the entire record and consider and weigh all the evidence in support of and contrary to the challenged finding. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We must

28

uphold the finding unless the evidence that supports it is so weak as to be clearly wrong or manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex. App.—Houston [1st Dist.] 1988, no writ).

In considering a factual sufficiency challenge, we must be mindful that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819. A jury may believe or disbelieve the testimony of a witness, in whole or in part, and may resolve any inconsistencies in a witness's testimony. *See Villarreal v. Guerra*, 446 S.W.3d 404, 411 (Tex. App.—San Antonio 2014, pet denied). As an appellate court, we may not pass upon the credibility of the witnesses, or substitute our judgment for that of the jury, even if the evidence would support a different result. *Id.* (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998)).

### B.  The Evidence Was Factually Sufficient to Support the Award of Loss of Future Earning Capacity.

Kelsey-Seybold argues that factually insufficient evidence supports the jury's award of $961,000 in loss of future earning capacity because Roberts had not had an amputation and still was working with no plans to retire. According to Kelsey-Seybold, this evidence showed Ford's mistake in calculating Roberts's loss of future earning capacity because she incorrectly assumed Roberts would separate from HFD.

But reviewing the entire record, the weight of the evidence supports the jury's award despite the testimony Kelsey-Seybold cites. Kelsey-Seybold is correct that Roberts had not had an amputation at the time of trial. But again, two medical experts testified that he probably would need one, and Roberts himself testified that he was considering an amputation as the only way to "go back to a more normal life." Likewise, Roberts's wife testified that Roberts talked about amputation with her and she believed he was "serious about it" because the ongoing pain was disrupting his life. Therefore, the jury could reasonably conclude Ford's calculations properly accounted for a future amputation.

It is equally true that Roberts was working as a firefighter paramedic at the time of trial, and that he planned to continue working for as long as possible. But Roberts also testified at length about the negative effects the injury was having on his ability to perform the daily activities of life, including his job, and the fact that his worsening symptoms required him to take pain medications regularly and attend frequent medical appointments. Roberts said that while he hoped to work as long as possible to maximize the retirement benefits offered by HFD, he did not know whether he could work long enough to meet the 20-year service mark for pension eligibility. Roberts's wife did not believe he would reach the 20-year mark.

Testimony from Roberts's colleagues also cast doubt on his ability to continue working for HFD. For example, Roberts testified he had transferred to a slower

30

station due to his medical limitations. But an HFD Paramedic Captain testified that firefighters need to be able to work at any station, and another paramedic testified that it would be "very tough" for Roberts to return to a busier station. An HFD District Chief added that Roberts already was unfit for duty and ineligible to be a paramedic because of the pain medications he was taking.

Based on this testimony, there was factually sufficient evidence to support Ford's assumptions that Roberts would separate from the Fire Department before he became eligible to receive retirement benefits. Indeed, Kelsey-Seybold's reply brief concedes that "the jury could infer, based on Dr. Elizondo's testimony, that changes in Mr. Roberts' vascular condition and his age would make being a firefighter and EMT less sustainable as Mr. Roberts continued working toward retirement." And to the extent such testimony conflicted with the testimony that Kelsey-Seybold relies on, "[i]t is the province of the jury to resolve conflicts in the evidence." *City of Keller*, 168 S.W.3d at 820.

### C. There Was Factually Sufficient Evidence for the Award of Future Medical Expenses.

Kelsey-Seybold next challenges the factual sufficiency of the evidence supporting the jury's award of $2.35 million for future medical expenses. Kelsey-Seybold argues that Dr. Elizondo's life care plan disregarded the possibility that Roberts would not need an amputation at all or at least not for many years, thus reducing the expenses estimated in the life care plan. But, as we have explained, the

weight of the evidence, including the testimony of Roberts and his medical experts, was such that a reasonable juror could find a reasonable probability not only that Roberts would need an amputation, but also that he would need one soon.

Kelsey-Seybold also makes a factual sufficiency challenge to the jury's award of future medical expenses based on the idea that Dr. Elizondo's life care plan fails to segregate medical expenses associated with an alleged "pre-existing hypercoagulability" that "Kelsey-Seybold did not cause." As discussed above, the evidence presented at trial reflected that Kelsey-Seybold's negligence *did* cause Roberts's vascular condition, and Kelsey-Seybold cites no evidence to suggest it was "pre-existing." Therefore, the weight of the evidence supports the assumptions underlying Dr. Elizondo's life care plan.

Kelsey-Seybold's reliance on *Texarkana Memorial Hospital, Inc. v. Murdock*, 946 S.W.2d 836, 840 (Tex. 1997), to support the contrary conclusion is misplaced. In *Murdock*, a baby born with congenital defects aspirated meconium during delivery, causing further complications. *Id*. at 837. The baby required multiple hospitalizations after birth, and he died 14 months later. *Id*. The mother sued, alleging that the doctor's failure to properly treat the meconium aspiration caused the baby's injuries and his need for further treatments. *Id*. at 837–38. The jury returned a verdict awarding the costs of the baby's medical care. *Id*.

The Texas Supreme Court concluded there was insufficient evidence on which the jury could award the mother damages for *all* the baby's medical expenses because she had not segregated the medical expenses attributable to the meconium aspiration from those attributable to the baby's other health conditions, such as his birth defects. *Id*. at 840–41. It recognized that the evidence showed "[t]here was more than one condition to be treated, each produced by an independent cause." *Id*. at 840. And as a result, the mother had to segregate the medical expenses resulting from the doctor's negligence in treating the meconium aspiration, the basis of the mother's suit, from those caused by the baby's birth defects, which was not the basis of the suit.

This case is different. The evidence presented at trial was that Roberts's vascular condition resulted from Kelsey-Seybold's failure to properly diagnose his clots. Unlike *Murdock*, Roberts was not suffering from multiple different injuries, "each produced by an independent cause." *Id*. at 840. The weight of the evidence indicates they were all caused by Kelsey-Seybold's negligence. Therefore, Dr. Elizondo did not have to segregate the medical expenses in his life care plan. We conclude there was factually sufficient evidence to support the jury's award of future medical expenses.

**D.      The Trial Court Properly Denied Kelsey-Seybold's Remittitur Request.**

Kelsey-Seybold alternatively asks us to remit the jury's awards for loss of future earning capacity and future medical expenses to conform to the trial evidence. It contends that even if there were legally and factually sufficient evidence to support those awards, they still should be remitted because they exceed the damage amounts presented at trial.

In considering a remittitur, the proper standard of review is factual sufficiency. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *Pope v. Moore*, 711 S.W.2d 622–24 (Tex. 1986). We must examine all the record to determine whether sufficient evidence supports the damage award, remitting only if some portion of the award is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope*, 711 S.W.2d at 624; *City of Dall. v. Arnett*, 762 S.W.2d 942, 957 (Tex. App.—Dallas 1988, writ denied).

Under this standard, we conclude remittitur is unwarranted. Kelsey-Seybold contends remittitur of the jury's $960,000 award for loss of future earning capacity is necessary because it exceeds what Ford presented. But as noted above, Ford testified that Roberts's future lost earning capacity could range from $747,618 to around $1.5 million. The jury's award of $960,000 falls within that range.

Kelsey-Seybold also argues the jury's award of $2.35 million in future medical expenses exceeds the damages evidence presented at trial, again because Dr. Elizondo's life care plan fails to consider scenarios in which Roberts either does not need an amputation at all or does not need an amputation for several years. But as we have explained, the weight of the evidence indicates Roberts will need an amputation, and that he may need one imminently. Therefore, the jury's award of $2.35 million in future medical expenses—which was below the $2.6 million cost of Dr. Elizondo's life care plan—is not "so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust." *Mar. Overseas Corp.*, 971 S.W.2d at 407. We overrule Kelsey-Seybold's second issue.

## III. The Trial Court Properly Denied Kelsey-Seybold's Request for Periodic Payments.

We turn next to Kelsey-Setbold's contention that the trial court should have granted its request to pay the judgment amounts periodically rather than in a lump sum. Kelsey-Seybold made this request under the Texas Medical Liability Act ("TMLA"), which allows for periodic payments of certain damages awards in health care liability cases. TEX. CIV. PRAC. & REM. CODE § 74.503. It did so in a post-judgment motion to modify, correct, or reform the judgment under Texas Rule of Civil Procedure 329b(a) and (g).

We review a trial court's order denying a request for periodic payments under an abuse of discretion standard. *See Regent Care of San Antonio, L.P. v. Detrick*,

610 S.W.3d 830, 837 (Tex. 2020). And on this record, we conclude the trial court did not abuse its discretion in denying Kelsey-Seybold's request for periodic payments.

## A.    The TMLA's Periodic Payment Provisions.

Requests for periodic payments in health care liability cases are governed by Subchapter K of the TMLA. TEX. CIV. PRAC. & REM. CODE §§ 74.501–.507. Subchapter K differentiates between future medical, health care, or custodial services damages and other future damages:

> (a) At the request of a defendant physician or health care provider or claimant, the court shall order that medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments rather than by a lump-sum payment.

> (b) At the request of a defendant physician or health care provider or claimant, the court may order that future damages other than medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments rather than by a lump sum payment.

TEX. CIV. PRAC. & REM. CODE §§ 74.503(a)–(b).

For future medical, health care, or custodial damages, the court "shall order" periodic payments at the defendant's request. *Id*. § 74.503(a). For other future damages that are not medical, health care, or custodial damages, the court "may order" periodic payments. *Id*. § 74.503(b).

Section 74.503 also sets out a series of findings the trial court must make in ordering periodic payments. Section 74.503(c) requires the trial court to "make a

36

specific finding of the dollar amount of periodic payments that will compensate the claimant for future damages." *Id.* § 74.503(c). And section 74.503(d) requires the trial court to "specify in its judgment ordering the payment of future damages by periodic payments the: (1) recipient of the payments; (2) dollar amount of the payments; (3) interval between payments; and (4) number of payments or the period of time over which payments must be made." *Id.* § 74.503(d). Once these "statutory prerequisites" have been satisfied, "[t]he award of at least partial periodic payments for future medical expenses is mandatory." *Virlar v. Puente*, 664 S.W.3d 53, 62 (Tex. 2023) (citing Tex. Civ. Prac. & Rem. Code § 74.503(a)).

The party requesting periodic payments must identify the evidence necessary to make these findings. *See Regent Care*, 610 S.W.3d at 837 ("The party requesting an order for periodic payments has the burden to identify for the trial court evidence regarding each of the findings required by section 74.503, and the findings must be supported by sufficient evidence."). But it is possible the trial record may not contain the evidence necessary to make these findings. If not, "the trial court has discretion to receive additional evidence for that purpose." *Id.*

The TMLA does not specify when a request for periodic payments must be made. *See Virlar*, 664 S.W.3d at 62 ("[A]lthough the statute does not specify when a defendant must request periodic payments, it does provide that Subchapter K does not become applicable until a verdict is entered exceeding $100,000.") (citing Tex.

37

CIV. PRAC. & REM. CODE §§ 74.502)). The Texas Supreme Court has allowed such requests to be made post-trial, *id.* at 63, but no Texas court has permitted a request for periodic payments to be made post-judgment.

**B.** **Kelsey-Seybold's Request for Periodic Payments.**

Kelsey-Seybold did not request periodic payments until after the trial court entered the judgment. But before turning to the request itself, a review of the events leading up to it is instructive.

At trial, the parties generally presented their evidence in present values and, as Kelsey-Seybold concedes, they did not present evidence intended to distinguish between expenses that would be incurred immediately versus those that would be incurred over time. Thus, when the jury rendered its verdict, it awarded amounts that, "if paid now in cash, would fairly and reasonably compensate . . . Roberts for his injuries."

The parties then prepared a proposed judgment that did not mention periodic payments. The proposed judgment was "approved as to form" by Kelsey-Seybold's counsel. And when the trial court held an entry of judgment hearing, Kelsey-Seybold affirmatively stated that it had no objections to the judgment's form. The trial court then signed and entered the judgment.

Thirty days later, Kelsey-Seybold first asked for permission to make periodic payments of all awards of future expenses in a motion to modify, correct, or reform

38

the judgment. Its motion proposed a payment plan under which Kelsey-Seybold would make annual payments to Roberts over 29 years, and it included an affidavit intended to show Kelsey-Seybold's financial responsibility. But Kelsey-Seybold's motion also recognized that there was "no evidence" presented at trial as to when Roberts would incur the future medical expenses awarded to him in the trial court's judgment.

### C. The Trial Court Did Not Abuse Its Discretion in Denying Kelsey-Seybold's Request for Periodic Payments.

On this record, the trial court did not abuse its discretion in denying Kelsey-Seybold's request for periodic payments. We first consider Kelsey-Seybold's request for periodic payments of the award for loss of future earning capacity. As Kelsey-Seybold concedes, section 74.503(b) gives trial courts discretion to award periodic payments of future damages "other than medical, health care, or custodial services." Thus, whether to allow periodic payments of the award for loss of future earning capacity was within the trial court's discretion. And because the jury determined that its award of $961,000 is the amount that "if paid now in cash" would compensate Roberts for his lost future earning capacity, the trial court was within its discretion in denying Kelsey-Seybold's request to disturb that award.

For the award of future medical expenses, Kelsey-Seybold contends the trial court abused its discretion in denying periodic payments because section 74.503(a)

requires that courts "shall order" periodic payments of health care costs "[a]t the request of a defendant physician or health care provider." But an order of periodic payments only becomes mandatory "*if* a defendant meets the statutory prerequisites." *Virlar*, 664 S.W.3d at 62 (emphasis added). Kelsey-Seybold did not.

One of the "statutory prerequisites" is a "specific finding of the dollar amount of periodic payments that will compensate the claimant for the future damages." TEX. CIV. PRAC. & REM. CODE §§ 74.503(c). As the party requesting periodic payments, Kelsey-Seybold had "the burden to identify for the trial court evidence" to support that finding. *Regent Care*, 610 S.W.3d at 837. But Kelsey-Seybold concedes that no such evidence was developed at trial. Therefore, Kelsey-Seybold failed to carry its burden of proving the "statutory prerequisites" to periodic payments. *Virlar*, 664 S.W.3d at 62.

In that regard, this case is like the Texas Supreme Court's decision in *Regent Care*. There, the jury awarded $3 million for future medical expenses, which left the plaintiff with an award of $1,256,358 after subtracting attorney's fees and expenses. *See Regent Care*, 610 S.W.3d at 833, 837. The defendant requested that the entire award be paid periodically; the plaintiff asked that $1 million be paid in lump sum and only the remaining $256,358 be paid periodically. *See id*. at 836–37. The trial court agreed with the plaintiff and ordered the defendant to pay $1 million in a lump sum and the remainder in installments. *Id*. at 837. On appeal, the defendant argued

40

the trial court should have ordered the entire amount to be paid periodically because "the record does not support the split between periodic and lump-sum payments ordered here." *Id*.

The Texas Supreme Court disagreed, concluding the trial court would have abused its discretion by ordering a larger portion of the award to be paid periodically. *Id*. at 838. It did so in part because the defendant

> did not point the court to any evidence supporting its request that the entire $3 million award be paid periodically, nor to evidence of *any* specific dollar amount of medical expenses that would be incurred periodically. . . . No party requested that the jury find the amount that would compensate [the plaintiff] if paid periodically—unsurprisingly, as Subchapter K had not been invoked. Nor did [the defendant] offer evidence post-trial from which the trial court could make such a finding.

*Id*. In other words, the defendant, as the party requesting periodic payments, failed to meet its burden to provide the trial court with evidence of "the dollar amount of periodic payments that will compensate the claimant for the future damages." TEX. CIV. PRAC. & REM. CODE § 74.503(c). Considering that failure, the trial court would have abused its discretion by ordering periodic payments. *See Regent Care*, 610 S.W.3d at 837.

The same principles apply here. Kelsey-Seybold had to point the trial court to evidence of the dollar amount of periodic payments that would compensate Roberts for his future medical expenses. *Id*. But it concedes the trial record does not contain evidence of medical expenses that might be needed immediately versus later. Indeed,

41

the record points the other way because the jury's award was of an amount that would compensate Roberts for his future medical expenses "if paid now in cash." Kelsey-Seybold thus did not carry its burden and was not entitled to periodic payments. *See Virlar*, 664 S.W.3d at 62.

The trial court may allow more evidence on the propriety of periodic payments. But the decision to allow more evidence is one over which the trial court "has discretion," *Regent Care*, 610 S.W.3d at 837. And on this record, we cannot say the trial court abused its discretion in declining to receive more evidence. Kelsey-Seybold did not request periodic payments until after judgment, the form of which Kelsey-Seybold expressly approved. Indeed, the development of evidence on the periodic payments issue likely would have required a hearing to cover many of the same issues, possibly with testimony from the same witnesses, as the trial had just covered.

## IV. The Trial Court Abused Its Discretion in Not Applying the Correct Judgment Interest Rate.

In its final issue, Kelsey-Seybold contends the trial court applied an incorrect judgment interest rate of 6.25 percent and abused its discretion by denying Kelsey-Seybold's motion to modify, correct, or reform the judgment to apply the correct rate.

The Texas Finance Code governs judgment interest rates in Texas. The post-judgment interest rate is "the prime rate as published by the Board of Governors of

the Federal Reserve System on the date of computation." TEX. FIN. CODE § 304.003(c)(1). "The prejudgment interest rate is equal to the post-judgment interest rate applicable at the time of judgment." *Id*. § 304.103. On the 15th day of each month, the Consumer Credit Commissioner determines the post-judgment interest rate for money judgments rendered during the succeeding calendar month. *See id.* § 304.003(b). The Consumer Credit Commissioner then sends that rate to the Secretary of State, and the Secretary of State publishes it in the Texas Register. *See id*. § 304.004. Therefore, the pre- and post-judgment interest rates are the rate determined by the Consumer Credit Commissioner and published in the Texas Register by the Secretary of State for the date of judgment. *See Fuentes v. Zaragoza*, 555 S.W.3d 141, 172 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

The trial court signed and entered its final judgment on October 22, 2022. The pre- and post-judgment interest rates published in the Texas Register for that date were 5.5 percent. *See* 47 Tex. Reg. 6484 (Sept. 30, 2022). The trial court nonetheless awarded pre- and post-judgment interest at the rate of 6.25 percent. Therefore, the trial court erred in awarding pre- and post-judgment interest at a rate higher than the statute permitted. *See Mediacomp, Inc. v. Cap. Cities Commc'n, Inc.*, 698 S.W.2d 207, 211–12 (Tex. App.—Houston [1st Dist.] 1985, no pet.) (trial court erred in awarding judgment interest at the rate of 10.79 percent when the rate published in Texas Register for date of judgment was ten percent).

43

Roberts's sole argument to the contrary is that "the prime rate on October 10, 2022" was 6.25 percent. Assuming that statement is true, it is irrelevant here, because Texas law requires that judgment interest rates be set according to the rate determined by the Consumer Credit Commissioner and published by the Secretary of State in the Texas Register, not the prime rate. TEX. FIN. CODE § 304.004. By not applying the Texas Register rate, the trial court erred. We therefore hold the trial court abused its discretion by denying Kelsey-Seybold's motion to modify the judgment to reflect the correct interest rate.

## Conclusion

We reverse that portion of the trial court's judgment awarding pre- and post-judgment interest at the rate of 6.25 percent. We remand the case to the trial court solely to modify the judgment to reflect pre-judgment interest on past damages at 5.5 percent, and to apply post-judgment interest at the rate of 5.5 percent. In all other respects, we affirm the trial court's judgment.

Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.